606 So.2d 891 (1992)
STATE of Louisiana, Appellee,
v.
David Ralph STROTHER, Appellant.
No. 24158-KA.
Court of Appeal of Louisiana, Second Circuit.
September 23, 1992.
*892 Blanchard, Walker, O'Quin & Roberts by A.M. Stroud, III, Shreveport, for appellant.
Richard Ieyoub, Atty. Gen., Baton Rouge, Paul J. Carmouche, Dist. Atty., Catherine M. Estopinal, Asst. Dist. Atty., Shreveport, for appellee.
Before MARVIN, C.J., and NORRIS and BROWN, JJ.
MARVIN, Chief Judge.
In this conviction in which the Louisiana Felony Sentencing Guidelines were applied, we affirm concurrent and consecutive hard labor sentences which aggregate 16 years imposed on a Shreveport "financial planner," David Ralph Strother, who bargained to plead guilty to five counts of theft over $500 perpetrated in his scheme to defraud five victims of more than $750,000 from 1986 into 1990.
Appealing the sentences as excessive, Strother additionally contends that the trial court's upward departure from the recommended sentence range on the Sentencing Guidelines grid is not supported by the circumstances and that the sentences should not have been made, in part, to run consecutively because his conduct in each count, charged in one bill of information, constituted a part of a common or continuing scheme.
The plea agreement was between the prosecution and Strother. The prosecution agreed not to file charges of theft from eight other victims totaling $192,682, and not to oppose Strother's request to the court that all sentences run concurrently. The court made no agreement with defendant and its sentencing authority was not enervated in any respect.
This court's review of the sentence is primarily based on La. Const. Art. 1, § 20 (1974), which prohibits the imposition of "excessive" punishment. We must also determine whether the trial court has complied with the mandate of CCrP Art. 894.1 to consider the recommendations of the Felony Sentencing Guidelines, effective January 1, 1992, and to state for the record the considerations it has taken into account, including any aggravating and mitigating circumstances which may be present, and the factual basis for imposing sentence. LRS 15:328.
We conclude the trial court's reasons for imposing the sentences, which are an upward departure from the Sentencing Guidelines Grid, are supported by the record and are justified.
Affirming, we find the sentences are not constitutionally excessive. See Guidelines § 101, 209; LRS 15:321-329. State v. Joles, 492 So.2d 490 (La.1986). U.S. cert. denied.

FACTS
Strother, a 49-year-old, was self-employed, preparing and filing income tax returns and operating an investment firm, known as Assets Management. He styled himself as a financial planner. Beginning in the mid-1980s he successfully began soliciting funds from some selected customers whose ability to "invest" he learned from the income tax returns he prepared for them. He represented to his victims that *893 he could provide for them a safe, secure, high yield, federally-insured investment in what he called IMC, "Institution Management Corporation."
IMC was not an institution or a corporation, but a checking account, solely controlled and created by Strother in a Shreveport bank. He induced his victims to "invest" their funds in his deceptively-named bank account.
Occasionally and when necessary to preserve the confidence of a particular victim of the scheme, he wrote to a victim an IMC check which appeared to be a high-interest return on invested funds. More often, however, he wrote IMC checks for his personal and "business" expenses, utilities, credit cards, membership fees and dues in a country club and a dinner club, a lease and maintenance on a Mercedes Benz, salaries of his Assets Management employees and office rent. From the IMC account he also paid himself a salary (more than $41,000) during one 18-month period and $7,600 in NSF bank overdraft charges on another bank account.
Ironically, the "books" Strother secretly kept on the IMC scam were discovered by Strother's employees at Assets Management, who revealed the scheme, causing the investigation and later institution of charges.
The district attorney's office found 13 investors who had been bilked out of almost $946,000 by Strother. The five victims named in the bill of information, like most of the other eight victims, were persons for whom Strother had prepared income tax returns, whose financial worth and ability were known in detail by Strother. Most of his victims were elderly retirees, some of whom were shown to have sustained emotional trauma as a result of Strother's thefts and inability to make any significant restitution.
In short, Strother practiced a rather typical Ponzi scheme, using, in part, the proceeds of later thefts to cover up earlier thefts to maintain the scam.

THE FIVE COUNTS AND THE SENTENCES IMPOSED
Strother defrauded each victim named in the bill of the respective totals shown, stealing from the five a total of $753,318 during these inclusive dates:

Graham 5/21/86-04/02/87 $260,470 (Count 4)
Young 7/24/87-04/12/89 $167,000 (Count 5)
Cook 5/25/88-01/19/89 $218,848 (Count 2)
Galliher 6/21/89-11/27/89 $ 82,000 (Count 3)
Black 4/4 and 04/06/90 $ 25,000 (Count 1)

On Count 4, in which a total of $260,470 was stolen from the victim for about a year which did not overlap in time with the other four counts, the sentence was eight years.
On Counts 1 ($25,000) and 3 ($82,000), which, like Count 4, did not overlap in time, the sentence on each count was three years, concurrent with each other, but consecutive to the eight-year sentence on Count 4.
On Counts 2 ($218,848) and 5 ($167,000), which overlapped in time, the sentence on each was five years, concurrent with each other, but consecutive to all other sentences. The aggregate is 16 years, eight years on Count 4, three years on Counts 1 and 3, and five years on Counts 2 and 5.
The trial court considered the time periods and the amount swindled from each of the five victims to assess the hard labor sentence in each count. No fines were imposed and restitution was not ordered.

THE FELONY SENTENCING GUIDELINES
The Louisiana Felony Sentencing Guidelines recommend a uniform sanctioning policy in felony cases for the purposes of achieving certainty, uniformity, consistency *894 and proportionality of punishment, fairness to victims and the protection of society. § 101A and D. See also LRS 15:326 D. The severity of the sentence should be "proportional" to the seriousness of the offense of conviction and the severity of the offender's criminal history. §§ 101E2, 103C.
The guidelines are advisory, not mandatory. LRS 15:326. A sentence shall not be declared unlawful or excessive solely because the sentencing court imposes a sentence that does not conform with the designated sentence range in the guidelines grid. LRS 15:328; CCrP Art. 894.1; § 103J.

TYPICAL VS. ATYPICAL CASES
The sentencing ranges in the guidelines grid are intended to be appropriate for, and to apply to, the "typical case" in which aggravating and mitigating circumstances are not present. § 103D.
Upward departures from the designated sentence range of the guideline grid should be made when one or more aggravating circumstances significantly differentiates the particular case from the "typical." § 209A3. The guidelines set forth 19 aggravating circumstances which, when present to a significant degree, differentiate the case under consideration as more serious than the typical case arising under a particular offense. § 209B. If the trial court finds one or more aggravating circumstances, then the grid range for the "typical case" is inapplicable and the trial court must exercise its reasoned discretion in determining the appropriate sentence.
As the name suggests, the guidelines provide the methodology to guide the trial court in exercising its sentencing discretion to achieve the purposes of the statute. The legislature has not mandated that the trial court follow the guidelines' recommended sentence ranges even for "typical" cases, recognizing that the sentence ranges are not appropriate for cases, such as Strother's, which are "atypical" because of specific aggravating circumstances. See § 209.
The guidelines suggest that a sentencing court, when confronted with an "atypical" case, should impose a sentence which it deems appropriate (within the legislatively established statutory parameters), and must set forth for the record the reasons why the sentence has been imposed.
The guidelines metaphorically afford the trial court a road map for articulating the reasons for sentence by listing more specific and detailed aggravating and mitigating circumstances than those circumstances that were formerly and only generally listed in CCrP Art. 894.1. See § 209. The newer list replaces the older list.

CONCURRENT VS. CONSECUTIVE SENTENCES
The guidelines suggest that concurrent sentences "should" be imposed if two or more criminal acts constitute parts of a common scheme. § 215A2 and CCrP Art. 883. While the word "should" is not mandatory, the guidelines clearly suggest that a trial court consider the presence of specific aggravating factors to determine to impose consecutive sentences.
The guidelines effectively, although broadly and generally, follow the existing sentencing jurisprudence, impliedly allowing, but not specifically addressing, the exceptions to general sentencing principles which have been carved out, case-by-case, in exceptional situations. See e.g., State v. Sherer, 437 So.2d 276 (La.1983); State v. Mims, 550 So.2d 760 (La.App. 2d Cir.1989).
The defendant argues that when two or more convictions constitute parts of a common scheme or plan, the terms of imprisonment shall be served concurrently unless the court expressly directs that some or all be served consecutively. CCrP Art. 883. State v. Derry, 516 So.2d 1284 (La.App. 2d Cir.1987), writ denied. We agree that a judgment directing that sentences arising from a single course of conduct be served consecutively requires particular justification from the evidence of record. State v. Thompson, 543 So.2d 1077 (La.App. 2d Cir.1989), writ denied.
Concurrent sentences for multiple offenses arising out of a single incident or *895 single course of conduct, however, are not mandatory. State v. Nelson, 467 So.2d 1159 (La.App. 2d Cir.1985). Consecutive sentences for multiple crimes arising from a single incident or course of conduct are not necessarily excessive. State v. Ortego, 382 So.2d 921 (La.1980), U.S. cert. denied; State v. Mills, 505 So.2d 933 (La.App. 2d Cir.1987), writ denied.

STROTHER'S CONDUCT IN LIGHT OF JOLES, SUPRA
As noted, Strother's conduct occurred during three separate and distinct time periods. He stole from Graham (Count 4) for about a year ending April 4, 1987. About 3½ months later, he began stealing from Young (Count 5) on July 25, 1987, and then from Cook (Count 2) on May 24, 1988. Within about two months after Young and Cook ceased "investing" in early 1989, Strother began stealing from Galliher (Count 3) on June 21, 1989. After Galliher ceased "investing" in late 1989, Strother began stealing from Black (Count 1) on April 4, 1990. His thefts were revealed in July 1990.
During the time of the five counts, 1986-1990, Strother was without prey on three occasions ranging from about two to five months. Considering three "resumptions" of his criminal activity with new victims, 1986-1990, the amounts stolen, and the individual age and circumstances of each victim, we find the trial court's justification for imposing, in part, consecutive, instead of concurrent, sentences on the five convictions to be in accord with the departure factors in the sentencing guidelines.
The fact that Strother was charged in a single bill does not control either the common-scheme issue or consecutive-concurrent sentence issue. Joles, supra.
Joles was charged with 35 counts of theft from a police jury of which he was president. He entered nolo pleas to 20 counts totalling $115,000 he stole in an eight-month period. The trial court distinguished and separated the 20 counts into four groups and imposed a consecutive sentence for each group, the aggregate sentences being 15 years. Joles complained of excessive, and, later, of illegal sentences.
To determine whether sentences on each of several counts in a single information should be consecutive or concurrent, the purpose and intent of the statute should be discerned. If the statute intends to prohibit the individual acts, each act may be punished separately. On the other hand, if the statute intends to prohibit the course of conduct, there can be but one penalty. Joles, 492 So.2d at 493.
Joles found that LRS 14:67 intended to prohibit individual acts of theft and that multiple penalties for Joles were proper because of the magnitude of the thefts (much less than here) and the betrayal of public trust (private, here). The sentences totalling 15 years (here 16 years) were held within the trial court's discretion, "even though the thefts constituted part of a continuing scheme against a single victim over a relatively short period of time." 492 So.2d at 495.
Here, there was more than one victim and a scheme intermittently practiced for about four years that produced almost ten times as much money as the Joles scheme produced. As we have demonstrated, Strother's thefts were "common" only insofar as a single victim "invested" periodically with Strother. Joles, supra. On three occasions in the five counts, Strother found himself without a victim.
As between the five victims, Strother's scheme was not common and his thefts, even from each victim were separate crimes which could have been punished separately even though the thefts were part of a continuing scheme, as in Joles.
Strother committed a series of thefts in a given period from each victim similar to the 20 thefts from one victim in Joles, cited supra. There the thefts were placed in four groups, each of which groups warranted consecutive sentences. LRS 14:67 permits a number of petty thefts from one victim to be aggregated into a major theft, but does not require that a number of major thefts be charged as only one theft. Joles, supra.
*896 Here the trial court did not follow the specific consecutive sentence formula set forth in § 215c. of the guidelines. While that specific formula is available to a trial court and may be applied, it is apparent from the statute that the specific formula need not be applied when the trial court has found, as the trial court found here, specific aggravating circumstances that warrant a departure from the grid ranges.

THE GUIDELINE GRID
The guidelines' recommendation for an appropriate sentence in the typical case of theft over $500 is found in grid cell 5G for a defendant, like Strother, who has no criminal background. The sentence for the typical defendant would be 80-120 months of "intermediate sanctions" which consist of sanctions other than incarceration, unless the term is served as periodic incarceration. § 207D1a.

REASONS FOR UPWARD DEPARTURE
In considering the recommendation of the guidelines grid, the trial court, correctly in our opinion, did not deem Strother's thefts involving large sums of money and over a span of four years as a "typical" theft.
Expressly noting the guidelines, the trial court observed that Strother had stolen $946,000 from 13 victims, but that at sentencing, 18 months after admitting his crimes, Strother had made no significant restitution. The court found Strother, before embarking on the scheme, had led an exemplary life without indication of criminality. The court mentioned that the designated sentence range of the guidelines grid recommended a probated sentence for a "typical case" of a first offender, but concluded probation would be totally inappropriate due to the aggravating circumstances which were present and would therefore defeat, rather than promote, the ends of justice.
We agree.
The court deliberately determined, under the statutory factors, to depart from the guidelines grid, assigning particular findings for doing so, as the guidelines suggest: Defendant knew the victims were particularly vulnerable because of their advanced age and circumstances. See § 209B(2). The victims now are facing the latter years of their lives in destitute conditions. See § 209B(9). Defendant used his position or status to facilitate commission of the offenses. See § 209B(4). He fraudulently gained the confidence of each victim, inducing the "investments" from later victims to facilitate and continue the confidence of earlier victims and conceal the earlier thefts. The offense was a "major" economic offense. See § 209B(14).
Robbing "Peter" and "Paul," Strother stole and apparently spent for his own benefit about $1 million over a four-year period. Eighteen months after admitting his crimes, Strother claimed indigency and inability to make restitution.
Technically a first offender, Strother committed "major" thefts from 13 known victims until his crimes were fortuitously discovered four years later. Any sanction less than a significant period of incarceration would deprecate the seriousness of his offenses.
In mitigation, and recognizing his personal history, the court found Strother had cooperated in a limited way with enforcement authorities and had acknowledged his criminal responsibility. The court was less convinced that Strother's "remorse" was genuine.
Strother's sentences on thefts from each victim, ranging from three to eight years, are less than the statutory maximum of 10 years. The lesser sentences for thefts in cases cited in Strother's brief (State v. Chapman, 490 So.2d 697 (La.App. 2d Cir. 1986); State v. Mitchell, 482 So.2d 1082 (La.App. 3d Cir.1986); and State v. Calamia, 490 So.2d 428 (La.App. 5th Cir.1986)) illustrate a trial court's sentencing discretion and do not support Strother's suggestion of an abuse of that discretion. Each of these cases merely held a sentence for thefts, less than Strother's, was not excessive. Similarly, Strother's reference to the 18-year sentence which was set aside in a homicide case is misplaced. State v. Taylor, *897 535 So.2d 1146 (La.App. 2d Cir.1988). Cases with dissimilar charges and facts need not be compared.
The trial court's consideration of these factors was proper: Strother's first offender status (State v. Jacobs, 493 So.2d 766 (La.App. 2d Cir.1986)); the gravity of the thefts (State v. Adams, 493 So.2d 835 (La. App. 2d Cir.1986), writ denied); the harm done the victims (State v. Lewis, 430 So.2d 1286 (La.App. 1st Cir.1983), writ denied); the risk of danger to the public (State v. Jett, 419 So.2d 844 (La.1982)); his apparent disregard for the property of others, (State v. Parker, 503 So.2d 643 (La.App. 4th Cir. 1987)); his potential for rehabilitation (State v. Lighten, 516 So.2d 1266 (La.App. 2d Cir.1987)); and the benefit he received from the plea bargain (State v. Adams, supra).
Whether the sentences are too severe depends on the circumstances of each case and of that defendant. A sentence violates LSA-Const. Art. 1, § 20 if it is grossly out of proportion to the seriousness of the offense or is purposeless or needless. State v. Bonanno, 384 So.2d 355 (La.1980). A sentence is considered grossly disproportionate if, when the crime and punishment are considered in light of the harm done to society, it shocks one's sense of justice. State v. Richardson, 545 So.2d 714 (La.App. 2d Cir.1989).
In excessive sentence assignments, we recognize the wide discretion of the trial court and require that a manifest abuse of that discretion be demonstrated before setting aside a sentence. State v. Square, 433 So.2d 104 (La.1983); State v. Madison, 535 So.2d 1024 (La.App. 2d Cir.1988). Here, all factors considered, we find the trial court was well within its discretion.

CONCLUSION
The court's articulation of reasons for imposing the sentences complies with the mandate of CCrP Art. 894.1. The aggravating factors of § 209B found by the court are factually supported. The court's upward departure from the Guideline grid's sentence range recommended for a typical case of theft is certainly in accord with the guidelines.
On this record, the sentences do not shock our sense of justice. We do not find the sentences to be constitutionally excessive or an abuse of the trial court's discretion. The sentences are
AFFIRMED.